IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>**EMILIO J. GONZALEZ-ESPINAL**,<br><br>Defendant. | Criminal No. 16-599 (FAB/BJM) |

## REPORT AND RECOMMENDATION

On August 24, 2016, federal law enforcement agents found contraband inside the residence of Emilio J. Gonzalez-Espinal ("Gonzalez") after executing a warrant for his arrest. He stands charged with possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1), and possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a). Docket No. 1. Gonzalez moved to suppress the contraband and his post-arrest statements, Docket Nos. 28, 34, and the government opposed. Docket No. 32. This matter was referred to me for a report and recommendation, Docket No. 30, and an evidentiary hearing was held on February 23, 2017. Docket No. 39.

For the reasons set forth below, the motion to suppress should be **GRANTED IN PART AND DENIED IN PART**.

### BACKGROUND

At the evidentiary hearing, the court heard testimony from DEA Agent Jose Betancourt ("Betancourt"), U.S. Postal Inspector John Botner ("Botner"), and Gonzalez's mother—Raquel A. Espinal-Solis ("Espinal"). Both parties submitted documentary evidence. Docket No. 40 ("Gov't Exs."); Docket No. 41 ("Def. Exs.").

*Layout of the Residence*

On August 24, 2016, the agents entered Espinal's residence in Puerto Nuevo (the "Puerto Nuevo Residence"). This residence has two living rooms, a dining room, a kitchen, three bedrooms, and a laundry room. After entering the residence's front door, one encounters two living rooms divided by a wall. Def. Exs. E, F, Docket Nos. 41-5, 41-6.

After passing these two living rooms, there is a hallway leading to the residence's three bedrooms and to the back part of the residence. Def. Ex. A, Docket No. 41-1. After exiting that hallway at the rear of the residence, one encounters a laundry room. Def. Exs. B, C, Docket Nos. 41-2, 41-3.

Espinal testified that on the morning of August 24, there were two doors at the end of the residence's hallway (one of which was made of iron) and that both of these doors were closed. Def. Ex. A. Botner recalled only one door at the end of that hallway, though he acknowledged that this door was closed. Espinal also testified that the door leading into the laundry room is maintained closed, while Botner could not recall whether that door was opened or closed when the warrant was executed. Def. Ex. B, Docket No. 41-2. Betancourt testified that the agents did not know the residence's layout before executing the warrant.

*Agents' Testimony*

Betancourt testified that on August 24, he received a federal arrest warrant issued against Gonzalez.[1] Seeking to execute that warrant, Betancourt (the agent in charge of the operation) and approximately 10 to 12 armed agents from various law enforcement agencies arrived to Gonzalez's Puerto Nuevo Residence at around 5:00 a.m. The agents knocked on the residence's front door, announced the presence of police, and called out Gonzalez's name. No one answered for approximately 20 to 25 minutes. After knocking on the door for over 20 minutes, the agents decided to force their way into the residence. As the agents were breaching the door, they heard a woman, later identified as Espinal, saying that she would open the door. Once Espinal did so, the agents ordered her to sit on a couch in the living room. At that time, the agents also noticed that Gonzalez was standing in the living room. Betancourt ordered Gonzalez to get on the ground and handcuffed him.

---

[1] As Gonzalez highlights in his motion to suppress, this federal arrest warrant was issued against him in a different federal drug case filed in this district. Docket No. 28 at 2. In that case, Gonzalez and four others were indicted with one count of conspiracy with intent to distribute cocaine. *See United States v. Herrera-Olavarria, et al.*, Criminal Case No. 16-526 (JAG), Docket Nos. 3, 5 (D.P.R.).

Afterward, Betancourt and the other agents began checking the house for other individuals. Betancourt relayed that a "protective sweep" is performed for "every arrest warrant" or search warrant, and this "protective sweep" is limited to places where a person might be found, such as a closet. The agents checked the dining room, the kitchen, and the first bedroom on the left. Miguel Baré ("Baré"), Espinal's husband, was found inside one of the residence's bedrooms and taken to the dining room. While the other agents continued the protective sweep, Betancourt returned to Gonzalez, who was dressed only in his boxer shorts or a towel. Betancourt asked Gonzalez to direct the agents to his room so Gonzalez could get dressed. Once inside that bedroom, Betancourt advised Gonzalez of the *Miranda* warnings. After doing so, Betancourt asked Gonzalez whether the residence contained any narcotics or firearms. Gonzalez responded in the negative.

Next, and around six to eight minutes after making the initial entry into the residence, Betancourt placed Gonzalez in a patrol vehicle parked outside the residence. At that time, U.S. Postal Inspector Eliezer Julian ("Julian") and Puerto Rico Police Department Officer Carlos Concepcion ("Concepcion") approached Betancourt. Julian informed Betancourt that marijuana had been found in the back part of the residence. After hearing this, Betancourt asked Gonzalez, "Why did you lie to me?" Betancourt also told Gonzalez that since he did not know whom that marijuana belonged to, he was required to "take everyone in the house."[2] This prompted Gonzalez to admit that the marijuana was his, to say that he could show the agents "everything else" (including weapons and drugs), and to assert that Espinal and Baré had nothing to do with the contraband.

Betancourt returned to the residence and told Espinal that there were drugs in the house belonging to Gonzalez. Betancourt asked Espinal for consent to search the residence, and told her that, if she declined to consent, Betancourt would have to take her out of the residence until he got a court order to search. Betancourt provided a consent form to

---

[2] Betancourt denied telling Gonzalez that Espinal would be arrested if he refused to cooperate, or that if he was a "man from the streets," he should "keep" Espinal "out of this."

Espinal, who was next to an armed law enforcement agent. After requesting Espinal's identification and confirming that she lived at the Puerto Nuevo Residence, Betancourt allowed Espinal to sign the form, which she did. Gov't Ex. 1, Docket No. 40-1.

Thereafter, the agents took Gonzalez to the back part of the residence. This part of the residence has an open area and a laundry room. Before entering the laundry room, Betancourt smelled an odor that his training and experience led him to believe was marijuana. Julian led Betancourt inside the laundry room and directed him to a plastic container holding a partially opened plastic bag containing marijuana. Betancourt opened the black plastic bag and photographed the marijuana. Gov't Exs. 2, 3, Docket Nos. 40-2, 40-3. After discovering the marijuana, Concepcion informed Betancourt that there was a firearm in a small backpack atop an ice cooler located near the laundry room.

That backpack contained two small containers, and Betancourt found a revolver and ammunition within one of those containers. After making this discovery, Betancourt asked Gonzalez if there was anything else. Gonzalez replied that there was cocaine inside his bedroom, prompting Betancourt and the other agents to take Gonzalez to that area of the residence. Once there, Gonzalez directed the agents to a small baggie atop a drawer. After finding that baggie, Betancourt searched the drawers inside the room and found three cell phones and a small notebook. Based on his training and experience, Betancourt suspected that the notebook was a drug ledger. Betancourt found two additional cellphones in plain view on a nightstand beside Gonzalez's bed. Gonzalez additionally conveyed that there was a weapon under the mattress, and Betancourt found a loaded firearm thereunder.

At around 6:00 a.m., the agents escorted Gonzalez out of the residence and transported him to the DEA office in Guaynabo. When the agents arrived to that office at around 6:10 a.m., Betancourt asked Gonzalez to sign a form with the *Miranda* warnings. Gonzalez signed the form at around 6:15 a.m., but he was not interviewed at that time. Gov't Ex. 4, Docket No. 40-4. Throughout all of Betancourt's interactions with Gonzalez, Betancourt spoke to Gonzalez in Spanish, and Gonzalez's demeanor was "peaceful" and

"cordial." Gonzalez respectfully answered the agents' questions and was not agitated, rude, defensive, or combative. Gonzalez did not express that he was unaware of what was happening, nor did he ask the agents to stop searching the residence. Espinal, who was worried but respectful, did not do so either.

Botner also participated in Gonzalez's arrest, and his testimony largely corroborated Betancourt's version of the events. As a U.S. Postal Inspector responsible for finding mail containing contraband, including marijuana, Botner has experience identifying that controlled substance. He, too, testified that after waiting "several minutes" for the residence's door to be opened, the agents began breaching the door. Botner relayed that Gonzalez was arrested as soon as the agents entered the residence, and that the agents then proceeded to "clear" the residence. Botner testified that the officers conduct a protective sweep for individuals who might be hiding "whenever" an arrest or search warrant is executed. The government's counsel asked Botner whether this is done in "all occasions," and Botner responded in the affirmative.

Botner also described the "protective sweep" conducted when the warrant was executed on August 24, saying that once the inside of the residence was cleared, the agents proceeded to the rear and side of the residence. Botner clarified that Julian was the agent who found marijuana in the laundry room, that Julian announced his discovery, and that there was a strong odor of marijuana in "the whole area." After finding the marijuana, Julian informed Betancourt of his discovery while Botner waited in the laundry room. And after Betancourt and the other agents arrived with the Gonzalez to the rear part of the residence, Gonzalez relayed that there was a firearm inside the backpack near the ice cooler. Gonzalez asked the agents for a cigarette, and Botner supplied him with one. While smoking the cigarette, Gonzalez said a second firearm could be found inside his bedroom.

*Espinal's Testimony*

Along with Baré and Gonzalez, Espinal has lived at the Puerto Nuevo Residence since May 2015. Gonzalez is not a party to the lease contract for this residence, but he has

keys to enter the residence and helps pay the rent, the water bill, and the electricity bill. Docket No. 34-2. Espinal's testimony as to the events on August 24 did not differ much from the narrative proffered by Betancourt and Botner. She testified that on the morning the warrant was executed, Gonzalez knocked on her bedroom door and informed her that there were loud noises coming from the residence's front door. Espinal saw flashlights shining into the residence and heard the agents "banging" on the front door. Wearing only a towel, Espinal nervously proceeded to the living room area and opened the residence's front door. According to Espinal, around seven to eight armed and uniformed officers entered the residence and handcuffed Gonzalez in the living room.

The agents asked Espinal whether anyone else was in the house, and Espinal replied that Baré was in one of the bedrooms. Baré was removed from that bedroom, but neither he nor Espinal were handcuffed. Espinal testified that she was cold and nervous and asked for a shirt and slippers; the agents brought her those items. Espinal takes various medications and suffers from hypertension, an enlarged heart, high blood pressure, and cardiac arrhythmia. The morning of August 24, Espinal took her blood pressure medication, but not the medication that makes her dizzy or sleepy. With two agents by her side, and feeling "sad," "nervous," and "ashamed," Espinal signed the consent form. Espinal was not told that she could limit or revoke the consent, but she acknowledged that she never asked the agents not to search or to stop searching.

## DISCUSSION

Gonzalez has moved to suppress his post-arrest statements, arguing that he was not advised of the *Miranda* warnings prior to making those statements. And arguing that the police conducted an impermissible warrantless search, Gonzalez also moved to suppress the contraband found inside his residence, including the marijuana, the two firearms, the ammunition, the drug ledger, and the five cellphones. Docket Nos. 28, 34. The government contends that Gonzalez lacked a reasonable expectation of privacy inside the Puerto Nuevo Residence, that the agents lawfully found the marijuana in plain view while conducting a

protective sweep of the residence, that the remaining contraband was found pursuant to Gonzalez's and Espinal's valid consent, and that Gonzalez's post-arrest statements were not obtained in violation of the Fifth Amendment.

**I.     Standing**

The Fourth Amendment protects individuals against unreasonable intrusion by the government, and this "protection stems from the Amendment's instruction that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" *United States v. McLellan*, 792 F.3d 200, 208 (1st Cir.), *cert. denied*, 136 S. Ct. 494 (2015) (quoting U.S. Const. amend. IV). "At [the Fourth Amendment's] very core stands the right of a [person] to retreat into his [or her] own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). Warrantless searches intruding upon that reasonable expectation of privacy are per se unreasonable unless the search falls within an established and well-delineated exception. *Katz v. United States*, 389 U.S. 347, 357 (1967).

In this case, Espinal testified that Gonzalez has been living at the Puerto Nuevo Residence since around May 2015, that Gonzalez has keys to access the residence, that Gonzalez has his own room within the residence, and that Gonzalez helps pay the rent and utilities. The court should find that this uncontroverted testimony sufficiently establishes that Gonzalez had a reasonable expectation of privacy inside the Puerto Nuevo Residence, including within his bedroom. *See United States v. Washington*, 573 F.3d 279 (6th Cir. 2009) (defendant was residing in uncle's apartment "for several months" and thus had standing to complain of a Fourth Amendment violation); *United States v. Romain*, 393 F.3d 63, 68 (1st Cir. 2004) (fairly regular overnight guest with keys to apartment had a reasonable expectation of privacy in that residence); *see also Payton v. New York*, 445 U.S. 573, 590 (1980) (unless it is shown that the defendant has some lesser expectation of privacy, "the Fourth Amendment has drawn a firm line at the entrance to the house").

## II.     Protective Sweep

The government asserts that the marijuana in the residence's laundry room was lawfully discovered in plain view during a protective sweep that followed the execution of Gonzalez's arrest warrant. The Supreme Court held in *Payton* "that police officers attempting to execute an arrest warrant have 'limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.'" *United States v. Werra*, 638 F.3d 326, 336–37 (1st Cir. 2011) (quoting *Payton*, 445 U.S. at 603). And a "protective sweep conducted in conjunction with the arrest of an individual in his home" is an exception to the Fourth Amendment's warrant requirement. *See United States v. Winston*, 444 F.3d 115, 118 (1st Cir. 2006). "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). "To prevent law enforcement from abusing the protective sweep by using it as a pretext for searching an individual's home, the Supreme Court has limited its use." *Winston*, 444 F.3d at 118.

"First, law enforcement officers conducting the sweep must have a reasonable suspicion of danger: 'there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *Winston*, 444 F.3d at 118 (quoting *Buie*, 494 U.S. at 334 & n.2). "The reasonable suspicion standard is 'considerably less demanding than the level of proof required to support a finding of probable cause,' . . . but must be based on more than an unfounded speculation." *Winston*, 444 F.3d at 118 (internal citations omitted). "Second, the scope of a protective sweep must be limited to its purpose"—it "'may extend only to a cursory inspection of those spaces where a person may be found.'" *Id.* (quoting *Buie*, 494 U.S. at 335). And "the duration of the sweep must be 'no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.'" *Winston*, 444 F.3d at 118 (quoting *Buie*, 494 U.S. at 335–36).

In this case, it is uncontested that the agents secured a valid warrant to arrest Gonzalez after he was indicted in a federal drug case involving multiple defendants. *See supra* Note 1. And to establish that the agents had reasonable suspicion to look in the laundry room for dangerous individuals, the government underscores that the agents knocked on the door for 20 to 25 minutes without anyone answering, that Baré stayed in his bedroom rather than accompanying Gonzalez and Espinal to answer the door, and that the agents were unaware of the residence's layout before executing the warrant. When taken together, these circumstances, the court should find, gave rise to a reasonable suspicion that a dangerous person could be found inside the laundry room.

First, and most importantly, Betancourt credibly testified that the agents knocked on the door for 20 to 25 minutes while announcing the presence of police and calling out Gonzalez's name. And though Espinal did not testify how much time transpired before she opened the door, her testimony reveals that there was some delay before she ultimately allowed the agents to enter. The officers could reasonably believe that the time they were kept waiting was used to allow individuals inside the residence to conceal themselves or prepare an ambush. *See Winston*, 444 F.3d at 119 (First Circuit found reasonable suspicion justifying protective sweep where, among other things, the "deceptive actions of" one of the residence's occupants "gave any potential occupants inside the house five minutes to conceal themselves or prepare an ambush").

And this belief was buttressed by the fact that Gonzalez had already been indicted in a drug conspiracy involving multiple defendants, some of whom could have been inside the Puerto Nuevo Residence on the morning of August 24. *See Winston*, 444 F.3d at 119 (court found reasonable suspicion justifying protective sweep where, among other things, defendant "was a potentially dangerous drug dealer who had recently purchased a bullet-proof vest and firearms and had numerous, potentially armed and dangerous cohorts"); *see also United States v. Acosta*, 67 F.3d 334, 339 (1st Cir. 1995) ("drug dealing is often associated with access to weapons"); *United States v. Anderson*, 859 F.2d 1171, 1177 (3d

Cir. 1988) ("Given that drug traffickers often carry weapons and reasonable suspicion existed that the [defendants] were drug dealers, the troopers reasonably suspected that both [defendants] were armed and dangerous").

Second, despite all the commotion and ruckus at the residence's front door, Baré strangely stayed in his bedroom rather than accompanying Espinal and Gonzalez to answer the residence's front door. While Baré might have done so for entirely innocent reasons, the reasonable-suspicion calculus does not depend on the lawfulness of an individual's conduct and the agents could reasonably believe that Baré was attempting to hide from the police. *See Thomas v. Dillard*, 818 F.3d 864, 877 (9th Cir. 2016) ("evasive and deceptive responses" to a police officer's questions are relevant when evaluating reasonable suspicion); *United States v. Woodrum*, 202 F.3d 1, 7 (1st Cir. 2000) ("The Supreme Court has held that, in some contexts, an obvious attempt to hide or to evade the authorities can be a factor in the calculus of reasonable suspicion."). And since at least one individual inside the residence appeared to hide from the agents, the agents could reasonably suspect that there were others hiding inside the residence.

Third, because the agents did not know the residence's layout, it was not immediately apparent to the agents whether someone could be hiding in the area at the end of the residence's hallway or in the laundry room located a short distance away from that hallway door. *See United States v. Burrows*, 48 F.3d 1011, 1016 (7th Cir. 1995) ("the particular configuration of the dwelling and the characteristics of those known to be present and who might be present must be the primary focus of the officers' assessment"). And the agents could reasonably perceive a heightened possibility of danger since the Puerto Nuevo Residence is enclosed by a surrounding wall. *See* Def. Ex. B, Docket No. 41-2; *United States v. Richards*, 937 F.2d 1287, 1291 (7th Cir. 1991) (an "ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings"). Thus, after considering the totality of the circumstances, the court should

find that the officers had reasonable suspicion to believe that a dangerous individual could be found inside the laundry room.

The court should also find that the agents conducted a limited and cursory inspection. Though the agents arrested Gonzalez in the living room area of his residence, Betancourt testified that other agents were still conducting the protective sweep, which was limited to places where a person could hide, as he escorted Gonzalez to the patrol vehicle. Additionally, the government highlighted that Julian found the marijuana inside the laundry room shortly after Gonzalez was arrested, and that the marijuana was found no more than seven to eight minutes after the agents initially entered the residence. This relatively short time period and the limited scope of the protective sweep complied with *Buie*'s command that agents may make only "a cursory inspection of those spaces where a person may be found," and that the duration of the sweep must be "no longer than is necessary to dispel the reasonable suspicion of danger." *See Buie*, 494 U.S. at 335; *see also Winston*, 444 F.3d at 119 (though the "agents immediately arrested" the defendant, the agents conducted a permissible "limited and cursory inspection" when they "walked immediately through the first floor and basement and moved a blanket covering a space large enough for a person to hide"). Thus, the court should find that the agents lawfully found the marijuana in plain view while conducting a lawful protective sweep for dangerous individuals.

To be sure, Betancourt suggested at the hearing that a "protective sweep" is performed when executing "every" arrest warrant. And Botner similarly testified that a protective sweep is conducted "whenever" an arrest warrant is executed. In this vein, the government's counsel asked Botner whether this is done in "all occasions," and Botner responded in the affirmative. This testimony is troubling—for the police are not automatically entitled in "all occasions" involving the execution of an arrest warrant to conduct a protective sweep throughout all areas of a residence. Rather, the agents may, "without probable cause or reasonable suspicion, look in closets and other spaces *immediately adjoining the place of arrest* from which an attack could be launched." *Buie*,

494 U.S. at 334 (emphasis added). "Beyond that, however, just as in *Terry* and *Long*, there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger." *Id.* at 334. Because the government has demonstrated that the agents' conduct in this case comported with the limitations set forth in *Buie*, the agents' testimony, while concerning, does not alter the findings recommended above.

## III. Consent

To show that the remainder of the contraband found inside the residence was lawfully discovered, the government relies on the consent of Gonzalez and Espinal. Valid consent is another "exception to the search-warrant requirement." *Winston*, 444 F.3d at 121. The government bears the burden of providing "valid consent by a preponderance of the evidence." *United States v. Forbes*, 181 F.3d 1, 5 (1st Cir. 1999). "The consent may be express or inferred from conduct." *Winston*, 444 F.3d at 121 (citing *United States v. Miller*, 589 F.2d 1117, 1130 (1st Cir. 1978) (defendant's unlocking of a suitcase constituted implied-in-fact consent that permitted officers to search the suitcase)).

To be valid, a person's consent must be voluntary. *See Winston*, 444 F.3d at 121. The voluntariness inquiry "turns on an assessment of the totality of the circumstances." *United States v. Barnett*, 989 F.2d 546, 554–55 (1st Cir. 1993). When conducting this assessment, courts should consider a party's "age, education, experience, intelligence, and knowledge of the right to withhold consent," *Id.* at 555, as well as "whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances." *Id.*

In this case, the government contends that Gonzalez consented to having the agents search the residence because Gonzalez told the agents that he would show them "everything else" and led them around the residence as he indicated where contraband would be found. This is how the agents found the revolver and ammunition inside the backpack, the baggie of cocaine on top of a drawer in Gonzalez's bedroom, and the firearm

under Gonzalez's bedroom mattress. Betancourt also discovered two of the cellphones in plain view atop a nightstand after Gonzalez directed the agents to the contraband in his bedroom. These circumstances show that Gonzalez impliedly consented to the search for these particular items. *See, e.g.*, *United States v. Stabile*, 633 F.3d 219, 231 (3d Cir. 2011) (occupant of residence consented to search where she "assisted the officers in their search of the house by leading them to several computers and, later, providing one officer with a screwdriver to help remove a hard drive"); *United States v. Pineiro*, 389 F.3d 1359, 1366 (11th Cir. 2004) (defendant validly consented where he "led investigators on a tour of his home" and "cooperated with their search efforts"); *United States v. Yeagin*, 927 F.2d 798, 801 (5th Cir. 1991) (defendant consented to search where, among other things, he "was cooperative throughout the incident, even telling the officers about the firearms and drugs in the room before they searched it").

The court should find that, under the totality of the circumstances, Gonzalez's consent was voluntary. On the one hand, there are some facts suggesting that Gonzalez's consent was not voluntary: he was handcuffed during the early morning hours by armed law enforcement agents pursuant to the execution of an arrest warrant. *See, e.g.*, *Winston*, 444 F.3d at 121 ("an in-home arrest pursuant to a search warrant is an inherently coercive situation, but such a situation does not preclude a finding of voluntariness") (citing *United States v. Watson*, 423 U.S. 411, 424 (1976)). And Gonzalez was not informed of his right to withhold consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.").

But, on the other hand, other circumstances revealed during the hearing established that Gonzalez's consent was voluntary. First, Gonzalez, who appeared to be a young man of average intelligence, cooperated with the agents by showing them where certain contraband would be found. *See, e.g.*, *Pineiro*, 389 F.3d at 1366 (defendant's cooperation

is one factor probative of voluntariness). Second, the agents did not induce Gonzalez's consent through threats, misrepresentations, or promises. *See United States v. Vazquez*, 724 F.3d 15, 19 (1st Cir. 2013) ("courts must also consider any evidence that law enforcement officers' . . . misrepresentation prompted defendant's acquiescence to the search.") (internal quotation marks omitted). Third, Betancourt advised Gonzalez of the *Miranda* warnings before Gonzalez led the agents around the residence. *See, e.g.*, *Barnett*, 989 F.2d at 555.

Fourth, Gonzalez gave consent in the familiar surroundings of his residence rather than at a police station. Fifth, Betancourt testified that Gonzalez's demeanor was "peaceful" and "cordial," that Gonzalez respectfully answered the agents' questions, and that Gonzalez was not agitated, rude, defensive, or combative. *See United States v. Kruger*, 151 F. Supp. 2d 86, 96 (D. Me. 2001) (consent found voluntary where, among other things, "officers testified that" defendant's "demeanor was cooperative and calm"). Thus, the court should not suppress the revolver and ammunition found inside the backpack, the baggie of cocaine found on top of a drawer in Gonzalez's bedroom, and the firearm found under Gonzalez's bedroom mattress.

The same result should not follow, however, with respect to the three cellphones and the drug ledger because there is insufficient evidence to show that Gonzalez expressly or impliedly consented to the search that revealed those items. At the hearing, Betancourt testified that Gonzalez indicated a baggie of cocaine would be found *on top of* a dresser in his bedroom. After Betancourt found this baggie, he—for some unexplained reason— "start[ed] searching the drawer" inside Gonzalez's bedroom. And "inside" the top drawer Betancourt found the drug ledger and the three cellphones. The court should suppress this evidence for two reasons. First, there was no evidence that Gonzalez expressly consented to the search of the *inside* of the drawer within his bedroom. And, second, there is insufficient evidence that Gonzalez impliedly consented to this particular search: Gonzalez did not indicate that contraband would be found *inside* the drawer, and the government did not present any evidence suggesting that Gonzalez made non-verbal cues from which

Betancourt could infer that he was authorized to look inside that drawer. *See Winston*, 444 F.3d at 122("implied-in-fact consent" may be "based entirely on silent *actions*" of the consenting party) (emphasis added).

And to the extent the government suggests that the drug ledger and the three cellphones should not be suppressed because Espinal's consent was also obtained, that argument lacks merit. "Consent to search is valid if it is (1) knowing and voluntary and (2) given by one with authority to consent." *See, e.g.*, *United States v. Digiovanni*, 650 F.3d 498, 513 (4th Cir. 2011). The government bears the burden of showing that a party had common authority.[3] *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). This authority rests upon "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-habitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 172 n.7 (1974). While the government suggests that Espinal had "common authority" over Gonzalez's bedroom, Espinal's uncontroverted testimony established otherwise.

Espinal testified that Gonzalez has his own room within the Puerto Nuevo Residence, that Gonzalez helps pay the rent, that no one may enter that room without Gonzalez's permission, and that individuals within that residence must first ask for permission to enter each other's rooms. Against this backdrop, the government did not elicit testimony or present evidence that Espinal regularly entered Gonzalez's room to, for example, use areas of that bedroom, such as a closet. Accordingly, these circumstances do not indicate that Espinal had common authority over the bedroom of her adult son. *See United States v. Jimenez*, 419 F.3d 34, 40 (1st Cir. 2005) (woman living in residence did

---

[3] The government also bears the burden of showing that the police reasonably obtained consent from someone with "apparent" authority to do so. *See Rodriguez*, 497 U.S. at 181. The government made no effort whatsoever to show that the "apparent" authority doctrine is applicable to the circumstances of this case.

not have common authority over defendant's bedroom where the bedroom was set aside for defendant's use, the woman did not "enter the room as a regular matter," the woman "was not supposed to enter the room," and the woman "did not even have a key to go into the room"); *cf. United States v. DiPrima*, 472 F.2d 550, 551 (1st Cir. 1973) (mother of adult son had common authority over defendant's bedroom where court found that defendant "shared the room" with his younger brother and "that his mother had free access thereto because she used the closet").

Moreover, even if it could be argued that Espinal had common authority over Gonzalez's bedroom as the head of the household, the government did not present evidence suggesting that this authority would extend to the drawer inside Gonzalez's bedroom. *See United States v. Block*, 590 F.2d 535, 541–42 (4th Cir. 1978) (while record evidence demonstrated that mother "had the normal free access that heads of households commonly exercise in respect of the rooms of family member occupants," this authority did not extend to adult son's locked footlocker); *State v. Pinegar*, 583 S.W. 2d 217, 220 (Mo. App. 1979) ("Although there here may be some question as to whether appellant had a reasonable expectation of privacy in the second floor room, used infrequently by him, shared at times by another, and the access to which was open to others in the family, the disposition of this aspect of the warrantless search need not turn upon a determination of the validity of the consent to the room search. Rather, the inquiry focuses upon the search of appellant's footlocker from which the incriminating evidence was seized"). Thus, the court should suppress the drug ledger and three cellphones found inside the drawer within Gonzalez's bedroom, but should not suppress the other contraband found within Gonzalez's residence.

### IV.     Fifth Amendment

Gonzalez contends that his post-arrest statements were obtained in violation of the Fifth Amendment because he was not advised of the *Miranda* warnings prior to his custodial interrogation. "The Supreme Court developed the *Miranda* rules as a prophylactic measure to dissipate the coercion inherent in the custodial interrogation setting, with a goal

of ensuring that any statements made by a suspect are truly the product of free choice and consistent with the Fifth Amendment to the United States Constitution." *United States v. Molina-Gomez*, 781 F.3d 13, 21 (1st Cir. 2015) (internal quotation marks omitted). It is thus settled that "*Miranda* warnings must be communicated to a suspect before he is subjected to 'custodial interrogation.'" *Id.* (quoting *United States v. Nai Fook Li*, 206 F.3d 78, 83 (1st Cir. 2000)). Because Betancourt testified that he advised Gonzalez of the *Miranda* warnings shortly after he was arrested and before any questioning, and because no evidence was presented to contravene this testimony, Gonzalez's argument lacks merit.

Gonzalez also suggested at the hearing that the agents were required to re-advise him of the *Miranda* warnings when he was placed in the patrol car. When evaluating "whether a delay between reading the *Miranda* warnings and custodial interrogation requires the interrogating officers to readvise the suspect of his *Miranda* rights," courts consider the totality of the circumstances. *See Treesh v. Bagley*, 612 F.3d 424, 431 (6th Cir. 2010); *see also Wyrick v. Fields*, 459 U.S. 42, 47 (1982); *Stumes v. Solem*, 752 F.2d 317, 320 (8th Cir. 1985) ("The nearly five-hour break between the interviews does not of itself invalidate the initial" *Miranda* waiver); *Jarrell v. Balkcom*, 735 F.2d 1242, 1254 (11th Cir. 1984) (circumstances of case did not render inadmissible a "confession given less than four hours after the issuance of *Miranda* warnings").

Here, Gonzalez was advised of the *Miranda* warnings shortly after he was arrested at around 5:25 a.m., and all the statements at issue were made not later than 35 minutes after that time. Because not more than 35 minutes elapsed after Gonzalez was advised of the *Miranda* warnings, and because there is no evidence that Gonzalez no longer understood the warnings previously given, the court should find that the agents were not required to re-advise Gonzalez of the *Miranda* warnings. *See United States v. Clay*, 408 F.3d 214, 222 (5th Cir. 2005) (additional warning unnecessary where there was no evidence suspect no longer understood warnings or did not understand their applicability to interrogation that occurred two days after initial warning); *United States ex rel. Patton v.*

United States v. Gonzalez-Espinal, Criminal No. 16-599 (FAB/BJM)                                                            18

*Thieret*, 791 F.2d 543, 547–48 (7th Cir. 1986) (*Miranda* re-advisement unnecessary after 40-minute lapse). Thus, the court should not suppress Gonzalez's post-arrest statements.

## CONCLUSION

For the foregoing reasons, the motion to suppress should be **GRANTED IN PART AND DENIED IN PART**. The court should suppress the drug ledger and three cellphones found inside the drawer within Gonzalez's bedroom. The court should not suppress the other contraband found within Gonzalez's residence or his post-arrest statements.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 21st day of March 2017.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge